Case 5:18-cv-00130   Document 84   Filed 08/12/22 in TXSD   Page 1 of 16

United States District Court
Southern District of Texas
**ENTERED**
August 12, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | |
|---|---|
| **LUIS OSCAR MARTINEZ,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| VS. § | **CIVIL ACTION NO. 5:18-CV-00130** |
| § | |
| **ANTONY J. BLINKEN,** *et al.*, § | |
| § | |
| **Defendants.** § | |

## ORDER & MEMORANDUM

Plaintiff Luis Oscar Martinez ("Plaintiff" or "Luis") seeks a declaratory judgment that he is a United States citizen by birth and is entitled to have the defendant, the Secretary of State, issue him a passport. The Secretary revoked Plaintiff's passport in 2018 on the grounds that Plaintiff was born in Mexico and was not a United States citizen. The issue is whether Plaintiff has met his burden under 8 U.S.C. § 1503(a) to prove by a preponderance of the evidence that he was born in the United States. After a two-day bench trial and a review of the evidence submitted by both parties, the Court finds and concludes that Plaintiff has met his burden of proving by a preponderance of the evidence that he was born in the United States, satisfying the requirements to be a United States citizen.

## Legal Standard

Title 8 U.S.C. § 1503(a) allows a plaintiff within the United States who is denied a privilege as a United States national, such as the issuance of a passport, to bring a declaratory judgment action under 28 U.S.C. § 2201. Section 1503(a) requires the reviewing court to make a *de novo* determination of citizenship. 8 U.S.C. § 1503(a); *see also Vance v. Terrazas,* 444 U.S. 252, 256

(1980). In the United States, "[t]here are two sources of citizenship, and two only: birth and naturalization." *Miller v. Albright,* 523 U.S. 420, 423 (1998). In this case, Plaintiff claims citizenship by way of birth in the United States.

To obtain a declaratory judgment of citizenship, Plaintiff bears the burden of proof to demonstrate "by a preponderance of the evidence, that he is an American citizen by birth." *Garcia v. Kerry*, 557 F. App'x 304, 308 (5th Cir. 2014) (citing *De Vargas v. Brownwell*, 251 F.2d 869, 871 (5th Cir. 1958)); *see also* 22 C.F.R. § 51.40. Proving a fact by a preponderance of the evidence means showing that the existence of said fact is more likely than not. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 (1983); *see also Matter of Briscoe Enters., Ltd. II,* 994 F.2d 1160, 1164 (5th Cir. 1993) (noting that "preponderance" is a lower standard than "clear and convincing" evidence). The Court, as the trier of fact in this case, must "believe that the existence of a fact is more probable than its nonexistence[.]" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 622 (1993).

There is no specific list of documents that a plaintiff must use to establish that he was born in the United States. *Moreno-Gonzales v. Tillerson*, 2018 WL 882393, at *2 (W.D. Tex. 2018). However, Section 1503(a) lawsuits "typically involve specific types of documentary evidence for which certain legal principles apply." *Garcia v. Limon,* 542 F. Supp. 3d 577, 582 (S.D. Tex. 2021). For instance, a properly registered and certified Texas birth certificate is considered "prima facie evidence of the facts stated in the record.'" *Id*. at 583 (citing Tex. Health & Safety Code § 191.052). "But this evidence is rebuttable, because prima facie evidence only refers to a minimum quantity, and constitutes enough evidence that raises either a presumption of fact, or that, which is sufficient, when unrebutted, to establish the fact." *Id*. (internal citations omitted). Further, "[t]he Full Faith and Credit Clause of Article IV, Section 1 of the United States Constitution does not

require federal courts to give preclusive effect to a determination by the Texas Department of Health and Human Services that a plaintiff was born in Texas." *Id*. (internal citations omitted).

In similar fashion, many district courts have found that a "contemporaneously filed foreign birth record creates a presumption of alienage and is almost conclusive evidence of birth in that country." *Id.* (citing *Sanchez v. Kerry*, 2014 WL 2932275, at *4 (S.D. Tex. 2014), *aff'd*, 648 F. App'x 386 (5th Cir. 2015))[1]. "A foreign birth certificate that contains accurate corroborating details, such as names and addresses, holds greater credibility than a record with incorrect or irregular information." *Id*. at 583 (citing *Sanchez*, 2014 WL 2932275, at *1).

At the bench trial, the Court sits as the trier of fact and must determine the credibility of the witnesses, weigh evidence, and make reasonable inferences. Fed. R. Civ. P. 52(a)(1),(6); *Herrin Motor Lines, Inc. v. Jarvis*, 156 F.2d 276, 277 (5th Cir. 1946); *United States v. Jennings,* 726 F.2d 189, 190 (5th Cir. 1984). If a plaintiff testifies or presents family testimony, the Court receives a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas*, 251 F.2d at 872.

## Factual Findings

The Parties dispute both the date and place of Plaintiff Luis Martinez's birth. Plaintiff contends that he was born on May 2, 1984 in Levelland, Texas. Defendant Antony Blinken (the "Government") contends that Plaintiff was born on June 29, 1982 in Saltillo, Coahuila, Mexico.

---

[1] Courts generally weigh whether a filing is "contemporaneous" on a sliding scale, and district courts have found that birth records filed within three, eight and eleven days after birth satisfied the standard. *See Candela-Rios v. Lynch*, 2017 WL 11046200, at *14 (W.D. Tex. 2017), *aff'd sub nom. Candela-Rios v. Sessions*, 737 F. App'x 187 (5th Cir. 2018) (three days after birth); *Cobos v. Kerry*, 2015 WL 3965660, at *1, *7 (S.D. Tex. 2015) (eight days after birth); *Beltran v. Rivera*, 2012 WL 2675477, at *3 (S.D. Fl. 2012) (eleven days after birth).

The Court will first discuss Plaintiff's accounting of events and the supporting testimony and evidence. The below accounting is based on witness testimony from Plaintiff ("Luis") himself, as well as testimony from Luis's father (Bartolo Martinez), brother (Cesar Martinez), and wife (Dora Elia Elizalde de Martinez).[2] The Court has also considered an affidavit from Luis's mother (Dora Elia Duron de Martinez) and a notarized letter from the midwife who helped birth Luis (Antonia Chacon). (Pl. Exhs. 19D-2, 19D-3.)[3] Both Duron and midwife Chacon—the only two individuals present for Luis's birth—have passed away and thus were not available to offer live testimony. (Pl. Exhs. 12, 15.) The Court has also reviewed the voluminous documentary evidence submitted by Plaintiff—all of which was admitted into the record without objection from the Government. Where relevant, the Court will also address the expert testimony and supporting report presented by Armando Luna, a former Secretary of State of Coahuila, who testified as an expert for Plaintiff on issues of Mexican law and practice regarding the registration of birth records in Coahuila.

After laying out Plaintiff's narrative of his birth, the Court will address the exhibits and testimony proffered by the Government that purport to undermine Plaintiff's story.

### A. Plaintiff's Narrative

Luis's parents, Bartolo Martinez Padron ("Bartolo") and Dora Elia Duron de Martinez ("Duron") are both Mexican nationals who married in Saltillo, Coahuila, Mexico, in around 1980.

---

[2] As the family members all share one of the same surnames (Martinez), the Court will use their first names for the sake of clarity. Since Plaintiff's mother and wife have the same first name—Dora Elia—the Court will instead use these individuals' first surnames to identify them.

[3] "Pl. Exh." refers to Plaintiff's exhibits which were introduced into the trial record. "Gov. Exh." refers to the Government's exhibits introduced into the trial record.

(Dkt. 77 at 18.)[4] Both parents worked as seasonal agricultural workers in Texas in the late 1970s and 1980s. (*Id.* at 16; 18-19.) Bartolo, who did not have a visa to enter the United States, would enter without authorization, crossing through the Rio Grande. (*Id.* at 18.) Duron would enter separately on her tourist visa, which she had held since 1970. (*Id.*; *see also* Pl. Exh. 32A.)

Bartolo testified that in January or February of 1984, he and his wife moved to Levelland, Texas for a temporary agricultural job. (Dkt. 77 at 17.) Duron was pregnant with the couple's first child, and so she stayed at home in the couple's rented trailer while Bartolo worked in the field. (*Id.* at 21.) According to Duron's affidavit, on May 2, 1984, while Bartolo was working, her water broke. (Pl. Exh. 19D-2.) She told her neighbor, and the neighbor took her to a nearby midwife, Antonia Chacon, who helped deliver Luis. (*Id.*) At the time, Duron had no way of communicating directly with her husband while he was working. (*Id.*) At some point within a day of Luis's birth, Bartolo's work supervisor received notice of the birth and told Bartolo his son had been born. (Dkt. 77 at 23.) Bartolo did not have a car and was not able to immediately go see his wife. Instead, he slept overnight in the field, and the next day, his supervisor drove him to the midwife's house to meet his firstborn son. (Dkt. 77 at 23-24.)

Though Luis was born on May 2, 1984, Bartolo testified that he was not able to pay the midwife immediately and the midwife thus delayed recording Luis's birth certificate. (Dkt. 77 at 26-28; 46-47.) The Texas birth certificate was later recorded on April 16, 1985—11 months after Luis's birth.[5] (Pl. Exh. 1)

---

[4] "Dkt. 77" refers to the trial transcript for day one of the bench trial. "Dkt. 78" refers to the transcript for day two of the bench trial. The Court primarily relied on the trial transcript in recounting its factual findings. However, where the transcript was unclear, the Court also revisited the audio recordings of the testimony presented at trial.

[5] Under Texas law, a birth certificate registered within a year of birth is not considered a "delayed" birth certificate. *Compare* Tex. Health and Safety Code § 192.021 (birth certificate filed more than

Soon after Luis's birth, Bartolo, Duron, and their newborn moved from Levelland to San Benito, Texas, where Bartolo continued to work in temporary agricultural jobs. (Dkt. 77 at 48.) From San Benito, Bartolo and Duron would travel regularly back and forth to Saltillo, where their families lived and where the couple wished to raise their son. (*Id.* at 48-49.)[6]

Bartolo testified that he believed he needed to obtain a Mexican birth certificate for Luis in order to enroll him in the Mexican school system. (Dkt. 77 at 33-34.) During this time, dual nationality did not exist under Mexican law, and thus was not possible to register a U.S.-born child as a Mexican citizen. (Dkt. 78 at 65-66; *see also* Pl. Exh. 35 at 30-31; 43.)[7] Based on testimony from both Plaintiff's Mexican law expert and the Government's testifying witness, there was a common belief in the 1980s that a Mexican birth certificate was necessary to enroll a foreign-born child in school in Mexico. (Dkt. 78 at 65-67; 103-04.)[8]

---

five days after birth but within one year not marked as delayed) *with* § 192.023(c) (birth certificate filed after one year must be marked as "delayed"). However, the Court does not consider a certificate filed 11 months after birth as "contemporaneously filed" for purposes of determining whether to afford it extra weight in this proceeding. For further discussion on the contemporaneous filing of the birth certificates in this case, see infra note 15.

[6] Bartolo was in many ways not a credible witness. He had difficulty remembering dates and details, and his chronology of events regarding what occurred after Luis's birth was confusing and jumbled. However, the Court found Bartolo's accounting of the events around the birth credible, and the passage of time explains much of Bartolo's inability to recall precise details of the events that followed. *Cf. Cobos v. Kerry*, 2015 WL 3965660, at *2 (S.D. Tex. 2015) (crediting parents' testimony as to the circumstances of birth even where parents had difficulty remembering dates and other details).

[7] Mexico's nationality law was subsequently revised in 1998 to allow for dual nationality for foreign-born Mexican children. (*Id.*)

[8] Plaintiff's expert testified that technically, there was a manner of registering foreign-born children in school in Mexico, but this required proof of foreign nationality, which U.S.-born children of Mexican parents were unlikely to have. (Dkt. 78 at 67.) In border states, registering a false Mexican birth certificate was the easiest way to have U.S.-born children be able to enroll in school. (*Id.*) The Government's witness—a U.S. consular official who procured the documents in

At some point in 1984 or 1985, while Bartolo was in Saltillo, he met a man—Ascacio—who worked for the state government. (Dkt. 77 at 32-34.) Ascacio told Bartolo that he could help him register a falsified Mexican birth certificate for his son, but that the birth certificate would need to be registered in the year 1982, as that was where there was an open spot in the record book. (*Id.*) Bartolo testified that he paid Ascacio to have this false birth certificate registered, utilizing that open spot. (*Id.* at 36.)

In January of 1986, Duron gave birth to the couple's second son, Cesar, in Saltillo, Mexico. (Dkt. 77 at 38-39.) Bartolo testified that he never attempted to register Cesar's birth in the United States, as he was born in Mexico. (Dkt. 77 at 39-40.)

In 1988, Bartolo and Duron applied for temporary resident status in the United States through the Special Agricultural Worker (SAW) program (Dkt. 77 at 16; *see also* Pl. Exhs. 30A, 32A). The SAW program permitted certain individuals who had worked in seasonal agricultural positions in the 1980s to obtain temporary lawful status in the U.S., and to convert said status into permanent residency after a year. *See* 8 U.S.C. § 1160(a). Both Bartolo and Duron were approved and later petitioned for lawful permanent resident status for their younger son, Cesar. (Pl. Exh. 38A.) Bartolo testified that he attempted to petition for resident status for Luis at the same time but was told that such a petition was not possible or necessary because Luis was a United States citizen. (Dkt. 77 at 39.)[9]

---

this case—testified that to send a child to school in the 1980s, the child needed to be a Mexican citizen and have a Mexican birth record. (*Id.* at 104.)

[9] Both Bartolo and Cesar maintain permanent resident status to this day. (Dkt. 77 at 16, 69.) Duron maintained permanent resident status until her death in 2015. (Dkt. 77 at 18.)

Luis himself testified that he grew up primarily in Saltillo and became aware that he was a United States citizen at approximately eight years of age. (Dkt. 77 at 87.) At around ten years old, Luis switched schools and had to reregister, at which point he learned that he also had a Mexican birth certificate, with a different date of birth. (*Id.* at 87-89.) Luis further testified that he would use the birthdate on his Mexican birth certificate (and corresponding age) for school purposes, and the birthdate on the Texas birth certificate with his family. (*Id.* at 101-02.)

Cesar, Luis's younger brother, also testified about his recollections of their childhood. Cesar testified that he became aware of his brother's U.S. citizenship at a young age, when the family was entering the United States. (Dkt. 77 at 70-71.) He realized his brother was presenting a different document (his U.S. birth certificate), while Cesar and his parents had to present their residency cards. (*Id.*) Both Cesar and Luis's wife testified that the family had always celebrated Luis's birthday on May 2 (the Texas birthdate) not on June 29 (the Mexican birthdate). (Dkt. 77 at 70.)[10]

In May of 2007, Luis applied for a U.S. passport, and was issued one the next month. (Dkt. 77 at 102.) In August of 2007, Luis and his father registered his U.S. birth certificate with the Mexican authorities, with the intention of correcting his date of birth and ensuring that his dual nationality was recognized by Mexican authorities under the changed nationality law. (Dkt. 77 at 102-05; 108.) This registration resulted in the existence of two contradictory records of birth for Luis in Mexico. (Pl. Exh. 35 at 41.) In 2020, Luis took legal action in Mexico to nullify his Mexican

---

[10] Plaintiff also introduced a text message exchange from 2017 between his wife and a coworker, with a photo and message of him celebrating his birthday on May 2. (Pl. Exh. 16.) This text exchange occurred prior to the Government's revocation of Plaintiff's passport and the initiation of this declaratory action—though after USCIS's initial investigation of Plaintiff's birth in relation to his wife's LPR status renewal.

birth certificate, leaving the Texas birth certificate as the only legal record of his birth in the Mexican registry. (*See* Pl. Exhs. 4, 5.)[11]

In 2010, Luis married Dora Elia Elizalde Castellanos ("Elizalde") in Laredo, Texas. (Pl. Exh. 10.) The following year, Luis petitioned for his wife to receive legal permanent resident (LPR) status, which was approved in July of 2011. (Pl. Exh. 19A.) In 2012, Elizalde received notice from United State Citizenship and Immigration Services (USCIS) that they planned to revoke her LPR status based on a Mexican birth record they had found for her husband. (Pl. Exh. 19C.) Elizalde responded to the notice of intent to rescind with a detailed evidentiary packet demonstrating that Luis was born in the United States. (*See* Pl. Exhs. 19D to 19D3.) This packet included much of the evidence submitted in the instant proceeding. After receiving this response, USCIS proceeded to renew Elizalde's LPR status. (Pl. Exh. 19D-4.) As of July 26, 2022, Elizalde's LPR status has not been revoked. (Dkt. 77 at 80.)

In 2017, Luis applied to renew his passport, which was renewed almost immediately. (Dkt. 77 at 102.) However, in May of 2018, the Government revoked Luis's passport on the basis that he was not a U.S. citizen, giving rise to this action. (Dkt. 21 at 1.)

In summary, Plaintiff contends that he is a United States citizen because he was born in Texas in 1984. Plaintiff acknowledges the existence of the 1982 Mexican birth certificate but claims that the Mexican certificate is a falsified document which was manufactured and fraudulently registered after his actual birth for purposes of allowing him to attend school in Mexico. Plaintiff argues that when his citizenship was previously questioned by USCIS, the

---

[11] The legal nullification of the 1982 Mexican birth record does not have a preclusive effect in this proceeding. *See Garcia v. Kerry*, 557 F. App'x 304, 308-09 (5th Cir. 2014) (upholding district court's determination that a Mexican court's nullification of a birth record was not entitled to preclusive effect in § 1503 proceeding).

agency made the determination that he was indeed a United States citizen. He asks the Court to arrive at the same result.

## B. The Government's Evidence

Having provided an overview of Plaintiff's accounting of events, the Court will examine the evidence presented by the Government that purports to undermine Plaintiff's narrative. The Government presented testimony from one witness, Teodoro Barajas ("Barajas"), a consular official who procured the Mexican documents that were entered into evidence as exhibits.[12] Barajas otherwise played no role in the Government's investigation of Plaintiff's birth.

Before addressing the Government's exhibits and witness testimony, the Court notes that the Government did not present any evidence to undermine the validity of the Texas birth certificate itself. The Government did not highlight any irregularities or mistakes[13] in the Texas

---

[12] In addition to the documents discussed in this section, the Government and Plaintiff both submitted copies of baptismal certificates, ostensibly both issued from the same parish in Saltillo. Both documents appear to have been issued by the same priest and state that they are "copies of the baptismal registry" of the parish. (Pl. Exh. 2; Gov. Exh. 4.) However, the certificates contain different information. Plaintiff's certificate, which was issued in 2011, includes his Texas date and place of birth and states that he was baptized on August 21, 1985. (Pl. Exh. 2.) The Government's certificate, which was issued in 2021, includes the Saltillo date and place of birth and states that Plaintiff was baptized on August 21, 1982. (Gov. Exh. 4.)

Neither party was able to present any testimony as to exactly how these copies of the baptismal certificate were obtained or why they contain contradictory information. Bartolo testified that his now-deceased wife had been the one who had handled all the baptismal paperwork. (Dkt. 77 at 60.) And Barajas testified that he had no recollection of obtaining the 2021 copy of the baptismal record but that he must have been the one to procure it. (*See* Dkt. 78 at 127-28.) Given this lack of testimony, the Court did not afford either exhibit significant weight in making its factual findings.

[13] The Court, having independently reviewed the Texas birth certificate, notes that the ages of Plaintiff's parents are correctly recorded, as compared to the incorrectly recorded age of Plaintiff's mother on his Mexican birth certificate. *See infra* note 16. There is one error in the Texas birth certificate—Dora Elia's name is incorrectly recorded as Dora Elena. (*Compare* Pl. Exh. 1 *with* Pl. Exh. 25.)

birth certificate, nor did the Government present any evidence that the midwife may have fraudulently filed this birth certificate.[14] As such, the Court affords the validly recorded Texas birth certificate significant weight in making its factual findings.

### i. The Mexican Birth Certificate

The Government places significant weight on Plaintiff's Mexican birth certificate, which raises a fact issue as to both Plaintiff's place and date of birth. (Gov. Exh. 1.) The birth certificate attests that Plaintiff was born in Saltillo on June 29, 1982, and purports to have been registered on August 9, 1982—more than one month after the alleged birth. (*Id.*)[15] The Government also

---

[14] In 2012, the midwife (Antonia Chacon) signed a notarized letter attesting that Plaintiff was born in her home in Levelland, Texas on May 2, 1984. (Pl. Exh. 19D-3.) Chacon has since passed away and thus the Court was not able to hear live testimony of her recollection of the birth. The Court did consider Chacon's letter in making its factual findings, as well as noting the lack of any evidence that Chacon filed falsified birth certificates—in contrast to the midwives in many other cases of this nature. *See, e.g., Villafranca v. Blinken,* 2022 WL 1210762 at *3 (S.D. Tex. 2022) (issuing declaratory judgment of citizenship even where midwife had been convicted of filing falsified birth certificates); *Garcia v. Limon*, 542 F. Supp. 3d 577, 583-85 (S.D. Tex. 2021) (same); *De La Cruz Vargas v. Blinken*, 569 F. Supp. 3d 556, 562 (S.D. Tex. 2021) (denying declaratory judgment where midwife had previously been convicted of falsifying birth records).

[15] Given that more than a month passed between the alleged birth and registration of said birth, the Court does not consider the Mexican birth certificate to be "contemporaneously" filed for purposes of assessing the weight to give this piece of evidence. As noted above, the Texas birth certificate was also not "contemporaneously" filed in this case. *See supra* note 5.

Further, the Court does not find the contemporaneous registration factor to be of much use in assessing the evidence in this case, where the parties disagree on both when Plaintiff was born, and when his Mexican birth certificate was registered. The question of contemporaneous registration of birth certificates may play an important role in a case where the birth date of the plaintiff is agreed upon. In those cases, courts reasonably give more weight to the birth certificate that was recorded contemporaneously, and less weight to the birth record that was recorded months or years after the birth. *See Villafranca*, 2022 WL 1210762 at * 5 (collecting cases). However, in the instant case, the Parties do not agree on the birth date of Plaintiff. Given this, the contemporaneous registration factor is largely irrelevant, as the Court would first need to decide Plaintiff's true place and date of birth—thus deciding the final issue of the case—before being able to determine which registration is truly contemporaneous to the birth.

introduced into evidence the birth certificates recorded before and after Plaintiff's certificate in the registry book. These birth certificates bear sequential "Certificate" and "Control" numbers and state that they were also registered on August 9, 1982. (Gov. Exhs. 2, 3.)

However, Plaintiff's Mexican birth certificate contains several irregularities that suggest that the certificate was indeed fraudulently registered. First, his mother's age is incorrect by two years.[16] The birth certificate also includes the names of witnesses unknown to Bartolo. (Dkt. 77 at 35.) The certificate's "Certificate Number" appears to have been altered and, unlike the sequential birth certificates, Plaintiff's certificate bears a sticker with his Clave Unica del Registro de Población ("CURP") number. (*Compare* Pl. Exh. 1 *with* Pl. Exhs. 2, 3.) Plaintiff's expert witness testified that he reviewed all 200 birth certificates contained in the relevant registry book, and Plaintiff's certificate was the only one bearing this additional CURP sticker. (Dkt. 78 at 61-62.)

Additionally, the certificate lacks the supporting documents necessary to register a birth in Mexico. Plaintiff's expert—Armando Luna, a former Secretary of State for Coahuila who oversaw the state's civil registry—testified at length about the process to register a birth in the state of Coahuila. To register a birth in Coahuila in the 1980s, parents would go to the local registry with the parent(s)' identification, a certificate of live birth, and a marriage certificate, where relevant. (Dkt. 78 at 15-16.) The registrar would then create a birth certificate in triplicate with carbon paper—with the original staying with the local registry office, one copy going to the parents, and one copy for the central state registry. (*Id.* at 17.) The registrar would also keep the supporting

---

[16] The Mexican birth certificate records Duron's age as 34, when she would have been 36 in June or August of 1982. (*See* Pl. Exh. 25 (Duron's permanent residence card with date of birth listed as 11/25/1945).)

documentation presented by the parents. (*Id.* at 17, 57.)[17] Once the individual registrar had accumulated 200 birth certificates, the registrar would have four books bound: (1) the original birth certificates; (2) copies of the birth certificates; (3) an appendix books containing the supporting documents corresponding to the birth certificates; and (4) a second copy of the appendix book. (Dkt. 78 at 56-59.) After these books were bound, the registrar would maintain the book of original certificates and the accompanying appendix book in the local office, and then would send the book of copies and an accompanying appendix book to the central state registry. (*Id.*)

In his work on Plaintiff's case, Luna testified that he went to both the local and central registry offices and requested copies of both the books of certificates and the accompanying appendix books. (Dkt. 78 at 27-29; 60-61.) Both offices had the relevant books of certificates, but neither office was able to provide the appendix book that corresponded to Plaintiff's birth certificate. (Dkt. 78 at 27-29; 60-61). The local office told Luna that the relevant appendix book had been destroyed by a fire, and the central office told him the book was not available because of an accident. (*Id.*)

As the Mexican birth certificate contains several irregularities and is not supported by any underlying registration documents, the Court affords the Mexican birth certificate little weight and declines to treat it as conclusive evidence that Plaintiff was indeed born in Mexico.

---

[17] The Government's witness—Teodoro Barajas—testified that certificates of live birth and appendices of supporting documents did not exist in the 1980s. (Dkt. 78 at 105-107.) While the Court found Barajas generally credible, it did not find Barajas' testimony as to the state of Mexican law or birth registration practice to be consistent or convincing, especially as he testified contradictorily in prior depositions. (*See, e.g.,* Dkt. 78 at 107-108 (Barajas' deposition testimony that the use of appendices was the practice in the 1980s).) As such, the Court credits Luna's testimony as to the use of appendices in the 1980s over the contradictory testimony of Barajas. (*See also* Pl. Exh. 35 at 30 (Luna's affidavit describing the 1975 law that required the use of appendices for birth records).)

### ii. The Index Page

In addition to the Mexican birth certificate itself, the Government submitted a single photocopied page from a federal birth index. (*See* Gov. Exh. 5.) This index page is an excerpt of an alphabetized list of births from the year of 1982, which includes Plaintiff's name, his 1982 birth date, and his CURP number. The index page also contains a date in the top right corner: August 16, 1983. As the Government highlighted in its closing, if this document were indeed created in August of 1983, it would be conclusive evidence that Plaintiff was not born in Texas in 1984.

However, the Government did not present sufficient evidence for the Court to understand the genesis of this index page or to definitively conclude that the document was created in 1983. The index page itself does not state that August 16, 1983 is the date on which the index was created. (Gov. Exh. 5; *see also* Dkt 78 at 117.) Barajas—the Government's witness who obtained the document—testified that based on looking at the document, he believed that this index page was created in 1983. (Dkt. 78 at 117.) However, Barajas had no personal knowledge of the creation of the document and the Government did not establish a basis for Barajas to testify as an expert on Mexican birth registration or indexing practices. (Dkt. 78 at 87-90.) The Government also did not provide any additional testimony or evidence to corroborate Barajas' lay opinion.

Without corroborating testimony or evidence, the Court has reasons to doubt that this index page was indeed created in 1983. Based on the testimony at trial, the Court has doubts that the central state registry would have been able to compile and produce a centralized index of births in eight months. Luna—an official with an intimate familiarity with the historical workings of the Coahuila civil registry—testified about the decentralized operation of the state-wide registry system, which created inefficiencies and delays in the registry's overall operation. (Dkt. 78 at 15-20; 43-44.) Luna provided an overview of the multiple steps that would have to occur before a

centralized index could be produced and opined that he would be surprised if the central state registry had been able to compile this index of births between the end of 1982 and August of 1983. (Dkt. 78 at 43-44.) The Government did not offer any testimony or evidence to counter Luna's credible opinion on this timing issue. In addition, testimony from both Luna and Barajas established that there were significant irregularities in Coahuila state registry practices during this time, including registry officials knowingly filing falsified birth records. (*See e.g.,* Dkt. 78 at 14-15; 19-23; 101-104; *see also* Pl. Exh. 35 at 33-38.) Given these irregular practices, the Court is hesitant to automatically presume the date listed on the index page coincides with the date the document was created.

Given the doubts around timing, the known irregularities in the registry's operation, and the lack of additional context for this document, the Court does not have enough evidence to conclude that the index page was created on August 16, 1983. As such, the Court declines to adopt the Government's position that this exhibit is conclusive proof that Plaintiff was born in 1982.

## **Conclusions of Law**

Having considered all the testimony and exhibits presented by both Parties, the Court concludes that Plaintiff Luis Oscar Martinez has demonstrated by a preponderance of the evidence that he is a United States citizen by birth. This case presented a close call, but the Court concludes that Plaintiff has met his burden of persuasion and the Government's proffered evidence is not irreconcilable with Plaintiff's accounting of events. The record, when viewed as a whole, tips the evidentiary scale slightly in Plaintiff's favor.

**Conclusion**

Based on the Court's findings of fact and conclusions of law, it is ORDERED that Plaintiff Luis Oscar Martinez's request for a declaratory judgment under 8 U.S.C. § 1503(a) is GRANTED. A final declaratory judgment will be issued in favor of Plaintiff by separate order.

IT IS SO ORDERED.

SIGNED this August 12, 2022.

_____
Diana Saldaña
United States District Judge